No. 26-1027

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

CALIFORNIA DEPARTMENT OF MOTOR VEHICLES

PETITIONER,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,

RESPONDENTS.

———————————————

## PETITIONER'S REPLY IN SUPPORT OF EMERGENCY MOTION
## UNDER CIRCUIT RULE 18 FOR A STAY AND FOR AN IMMEDIATE
## INTERIM ADMINISTRATIVE STAY

## RELIEF REQUESTED BY FEBRUARY 20, 2026

———————————————

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney*
  *General*
R. MATTHEW WISE
SETH E. GOLDSTEIN
  *Supervising Deputy Attorneys*
  *General*

KRISTEN C.A. KIDO
SHIWON CHOE
BARBARA HORNE-PETERSDORF
JOSEPH H. MEEKER
DAVID S. GREEN
JAY C. RUSSELL
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3617
Fax: (415) 703-5480
Jay.Russell@doj.ca.gov
  *Attorneys for Petitioner*
  *California Department of Motor*
  *Vehicles*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................ 1

I.     DMV Is Likely to Succeed on the Merits ................................. 2

     A.    FMCSA Lacked Authority for Its Final Determination Given the Unambiguous Regulatory Language ........................................................ 2

     B.    FMCSA's Failure to Adhere to the Standard Administrative Process Blocks DMV's Compliance with FMCSA's Demands ................................. 4

          1.    There Was No "Mutually Agreed Upon" Schedule for DMV's Corrective Action ............... 4

          2.    By Repeatedly Moving the Goalposts, FMCSA Has Prevented and Continues to Prevent DMV's Compliance with the Corrective Actions and California Law ............... 6

          3.    FMCSA's Indefinite "Pause" is Ultra Vires ......... 9

II.    California Will Suffer Irreparable Harm Absent a Stay ......... 11

III.   FMCSA's Final Rule Makes DMV's Requested Stay More Urgent ................................................................ 12

Conclusion ................................................................ 13

Addenda .................................................................. 15

Index of Addenda ........................................................ 16

Addendum 1 .............................................................. 17

# TABLE OF AUTHORITIES

**Page**

CASES

*Christensen v. Harris Cnty.*
    529 U.S. 576 (2000)...............................................................3

*Maine v. Taylor*
    477 U.S. 131 (1986).............................................................11

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut.*
    *Auto. Ins. Co.*
    463 U.S. 29 (1983)................................................................4

*Rivera Lujan v. FMCSA*
    No. 25-1215, 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025) ....................12

*Robinson v. Shell Oil Co.*
    519 U.S. 337 (1997)...........................................................2, 3

*Trump v. CASA, Inc.*
    606 U.S. 831 (2025).............................................................11

STATUTES

California Vehicle Code § 13100 ....................................................11

OTHER AUTHORITIES

49 C.F.R.
    § 383.73...........................................................................3
    § 383.73(f)(2) ...................................................................3
    § 384.307(a) .....................................................................9
    § 384.307(c)-(d) .................................................................4
    § 384.405(a) ..................................................................9, 10
    § 384.405(h) ....................................................................10

91 Fed. Reg. 7044 (Feb. 13, 2026) ..................................................12

Cal. Code Regs. Title 13, § 26.02(c) ...............................................11

**INTRODUCTION**

Respondents repeatedly contend that the California Department of Motor Vehicles (DMV) has moved for an emergency stay to provide "improperly issued" commercial driver's licenses (CDLs) to non-domiciled drivers. Opp'n 2, 11-13, 15. Not true. Respondents' opposition obscures the difference between federal and state law when it describes licenses with inconsistent expiration dates as "improperly issued." Such licenses are not deficient under *federal* law.

Thousands of drivers who still qualify for CDLs under state and federal rules are being prevented from renewing their licenses—or even replacing lost or stolen licenses—because of the Federal Motor Carrier Safety Administration's (FMCSA) indefinite "pause" on *all* non-domiciled CDLs transactions. DMV has identified licenses for cancellation for being noncompliant with *California* law. FMCSA has no authority to enforce California law. At the same time, FMCSA has insisted since September that DMV "pause" all transactions concerning non-domiciled CDLs, preventing DMV from effectuating its own laws requiring cancellation and reissuance of licenses.

DMV has addressed the other issues FMCSA identified in its Final Determination—including canceling licenses issued to non-DACA citizens of Mexico and Canada—and stands ready to cancel licenses with inconsistent expiration dates. DMV extended the license cancellation date expecting that

FMCSA would work in good faith to review DMV's actions and allow it to resume issuing non-domiciled CDLs by March 6, thus avoiding unnecessarily disenfranchising qualified drivers. But FMCSA's mandated "pause" causes harm to that particular cohort and others, impacting the livelihoods of non-domiciled drivers whose CDLs suffer from no deficiency under state or federal law, but that simply expire in the normal course.

Prohibiting DMV from effectuating California law by preventing it from renewing or replacing qualified drivers' licenses threatens the basic functioning of essential public services. A stay will allow DMV to renew, replace, and correct CDLs that comply with California law *and* federal regulations.

## I. DMV IS LIKELY TO SUCCEED ON THE MERITS

### A. FMCSA Lacked Authority for Its Final Determination Given the Unambiguous Regulatory Language

No federal law requires a CDL to expire on or before the date of a driver's legal presence document. FMCSA argues that because a driver must present an "unexpired" legal presence document at the time of application, "it follows as a matter of course" that a CDL should expire consistent with that legal presence document. Opp'n 20. FMCSA is wrong.

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Here, the relevant federal regulations are unambiguous: States

must "[m]ake the CDL valid for no more than 8 years from the date of issuance." *Id.*, § 383.73. The procedures for issuing non-domiciled licenses are "identical" to those for issuing a resident license, apart from three exceptions that do not address expiration dates. *Id.*, § 383.73(f)(2).

The plain language is dispositive. *Robinson*, 519 U.S. at 340 ("Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.") (internal quotations omitted). Undaunted, FMCSA argues that, as a matter of logic, CDLs must expire at the same time as a driver's legal presence document. Opp'n 20. But FMCSA cites no authority to support this argument. It cannot—because no federal requirement ties a CDL term to the term of a driver's legal presence documents.

Moreover, FMCSA's presumption is factually incorrect. That applicants must establish some *present* condition to apply for licenses does not mean that condition controls *future* license expiration dates. A driver's legal presence period may be extended, or their immigration status may change through marriage, legal residence, or citizenship. Just as a driver's immigration status does not affect his safety on the road, a driver's CDL status does not affect his eligibility to remain and work in the United States. Even if there were reason to tie a CDL term to legal presence date, "following as a matter of course" is not a tenet of statutory construction. The regulations mean what they say. *See, e.g., Christensen v. Harris*

3

*Cnty.*, 529 U.S. 576, 588 (2000) ("To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation.").

FMCSA also argues that DMV's CDL issuance procedures had faults aside from mismatching expiration dates. Opp'n 2, 10. But "when an agency relies on multiple grounds for its decision, some of which are invalid," courts should only "sustain the decision [where] one is valid and the agency would clearly have acted on that ground even if the other were unavailable." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And DMV has corrected all other alleged deficiencies. *See* Decl. Gordon, Exs. D and J; Supplemental Decl. Gordon Supp. Emergency Mot. to Stay (Supplemental Decl. Gordon), Ex. N. Even if it had not, FMCSA's Final Determination makes clear that the expiration date issue was the primary (if not only) reason it was issued. Decl. Gordon, Ex. K 8 (Addendum 140).

### B. FMCSA's Failure to Adhere to the Standard Administrative Process Blocks DMV's Compliance with FMCSA's Demands

#### 1. There Was No "Mutually Agreed Upon" Schedule for DMV's Corrective Action

FMCSA is required by law to work with a State to develop a corrective action plan to be implemented based on a mutually agreed upon schedule. 49 C.F.R. § 384.307(c)-(d). FMCSA never did so. FMCSA's Conditional Determination

sought additional information regarding "the approximate date by which the rescission of noncompliant non-domiciled CLPs and CDLS *and reissuance,* if eligible, will be completed."  Decl. Gordon, Ex. C at 11 (Addendum 82) (emphasis added).  DMV provided FMCSA with this information on December 10, identifying January 5 as the cancellation date.  *Id.*, Ex. D at 7-8 (Addendum 91-92) ("The 60-day period provided in the cancellation notices . . . will expire on January 5, 2026.  Any *remaining* non-compliant licenses . . . will be canceled and recorded in CDLIS on January 5, 2026.") (emphasis added).

In its December 10 letter, DMV explained that it had satisfied FMCSA's demands and intended to resume issuing non-domiciled CDLs on December 17. Decl. Gordon, Ex. D at 10 (Addendum 94).  DMV anticipated that affected drivers could reapply for a license compliant with state and federal law between December 17 and January 5 and avoid being disenfranchised because of FMCSA's "pause." DMV told FMCSA exactly this: "Because [December 17] will precede the end of the 60-day cure period provided in the cancellation notices . . . DMV may take action to issue corrected CDLs to eligible drivers[.]"  *Id.* at 10-11 (Addendum 94-95).

Further, as explained in DMV's motion (Mot. 8-9), prior to DMV's extension of the cancellation date to March 5, 2026, FMCSA and DMV discussed extending the January 5 cancellation date to give FMCSA time to further review DMV's

corrective actions, which FMCSA field staff agreed was reasonable. Decl. Gordon ¶11 (Addendum 32). And on December 18, 2025, FMCSA wrote to DMV stating that if DMV intended to extend the January 5 cancellation date for the noncompliant California licenses, DMV "should notify FMCSA in writing of the proposed extension." *Id.*, Ex. F at 3 (Addendum 103). DMV did so. *Id.*, Ex. G. at 1 (Addendum 108).

FMCSA and DMV never mutually agreed that all 20,000 noticed licenses would be canceled on January 5, 2026. Rather, DMV complied with FMCSA's information requests and stated that it intended to issue corrected licenses in the interim. It was not until the January 7 Final Determination that FMCSA said anything about a January 5 date being "critical" to its determination.

## 2. By Repeatedly Moving the Goalposts, FMCSA Has Prevented and Continues to Prevent DMV's Compliance with the Corrective Actions and California Law

FMCSA has repeatedly demanded that DMV "reissue" licenses under its interpretation of CDL regulations. Decl. Gordon, Ex. A at 14 (Addendum 51); Ex. C at 4 (Addendum 74). But at the same time, FMCSA is blocking issuance prohibiting *any* transactions on non-domiciled CDLs. Decl. Gordon, Ex. E (Addendum 97). It is thus *impossible* for DMV to comply with FMCSA's demands. Indeed, it appears that FMCSA never intended for DMV to reissue licenses to eligible drivers at all. When DMV inquired about how it could proceed

with correcting expiration dates for the 20,000 noticed drivers, FMCSA refused to even review DMV's corrective actions until licenses were "cancelled"—not corrected or reissued. *Id.*, Ex. M at 1 (Addendum 147). Given FMCSA's intransigence, it is apparent that FMCSA's aim is to expedite cancellation of non-domiciled CDLs and leave no recourse to renew them. Its actions make sense only as a manifestation of hostility to immigrant drivers and a desire to force them from the commercial market.[1]

FMCSA's continuous demands for new information also demonstrate its true intent, and DMV has diligently worked to comply with FMCSA's requests. Specifically, DMV:

- immediately paused issuing non-domiciled CDLs;

- immediately stopped changing CDL age restrictions when FMCSA demanded it do so;

- reviewed 65,000 records of unexpired non-domiciled CDLs to determine compliance with federal and state law;

---

[1] California's CDL holders are safer than the national average, and non-domiciled drivers are involved in fewer fatal crashes than other CDL holders. *See* Mot. 19 (collecting data from federal sources, including FMCSA).

- rescinded CDLs violating FMCSA's newly asserted interpretations of regulations;[2]

- stopped issuing temporary non-domiciled CDLs before validating a driver's lawful presence;

- identified procedural and technical anomalies causing licensing errors and implemented safeguards to prevent future errors;

- retrained staff on new policies and procedures; and

- provided FMCSA audit results orally and in writing.

Decl. Gordon, Exs. B, D, J at 1 (Addendum 124); Supplemental Decl. Gordon, Exs. N and O.)[3]

All this to no avail. FMCSA continues to demand additional information, apparently without end (*see, e.g*, Opp'n Addendum 161-63), all while non-domiciled drivers whose licenses suffer from no defect daily lose those licenses

---

[2] FMCSA claims that DMV extended the deadline for canceling CDLs issued to Mexican and Canadian citizens. Opp'n 21. Not so. Although DMV disagrees with FMCSA's interpretation of this rule, DMV canceled these CDLs on February 13. Decl. Gordon, Ex. D at 10 (Addendum 94).

[3] FMCSA asserts that DMV did not provide requested information, such as training procedure documents. Opp'n 12, 16. DMV provided FMCSA with its updated training materials on December 18. Supplemental. Decl. Gordon, Ex. N. Accordingly, the only demands DMV has not met are to (1) reissue licenses, because FMCSA has instructed it not to do so, and (2) cancel CDLs with expiration date errors, because no federal law requires it.

and their ability to work, as those licenses expire in the normal course and cannot be renewed.

FMCSA argues that DMV's motion seeks to allow it "to resume the issuance of non-domiciled CDLs." Opp'n 14. Not so. DMV seeks an order permitting it to correct, "renew[] or replac[e] the licenses of drivers who meet all criteria for driving a commercial vehicle" without being subject to decertification. Mot. 2. FMCSA has threatened to de-certify California's CDL program altogether if it violates any of FMCSA's demands, including by transacting on any non-domiciled CDLs during FMCSA's mandated "pause." Decl. Gordon, Ex. E at 1 (Addendum 97). A stay of the Final Determination and FMCSA's "pause" is necessary to allow DMV to effectuate California licensing laws without risking de-certification while FMCSA continues its audit.

### 3. FMCSA's Indefinite "Pause" is Ultra Vires

FMCSA asserts that "DMV does not dispute FMCSA's authority to order [the] pause or that the pause was appropriate when issued." Opp'n 14. Yet DMV specifically challenged FMCSA's "continued prohibition on DMV issuing non-domiciled commercial licenses." Mot. 14-15. Indeed, FMCSA's arbitrary and capricious orders—including its demand for an apparently indefinite pause—are the gravamen of DMV's petition.

Moreover, the regulation FMCSA cites as authority to institute a "pause" shows the extent of FMCSA's overreach. *See* Opp'n 14. 49 C.F.R. § 384.405(a) describes what FMCSA may do *after* a finding of non-compliance. It does not authorize halting a State's CDL activities *before* that finding or during the audit process. 49 C.F.R. § 384.307(a).

Nor would decertification of California's CDL program have authorized such action. The decertification regulation only permits FMCSA to prohibit a State from processing (1) initial license applications; (2) renewals; (3) transfers; and (4) upgrades. 49 C.F.R § 384.405(a). Thus, even decertification would not prohibit DMV from replacing a lost license or correcting a license issued inconsistent with state law. *See id.*, § 384.405(h) (decertification does not retroactively affect validity of unexpired CDLs). Section 384.405(a) does not counsel against a stay: rather, it shows one is necessary to prevent FMCSA's abuse of its discretion to review CDL programs.

FMCSA's argument that DMV seeks to "short-circuit" the administrative review process (Opp'n 16) is belied by the facts. A stay will prevent further harm to California and to the qualified CDL holders who are daily losing their licenses through FMCSA's repeated failure to follow proper administrative procedures.

## II. CALIFORNIA WILL SUFFER IRREPARABLE HARM ABSENT A STAY

FMCSA argues that California will not suffer harm until the new fiscal year because funding will not be withheld under the Final Determination until then. Opp'n 18. But DMV's supporting evidence described the immediate impacts of FMCSA's decisions. Decl. Duncan ¶¶ 4-8 (Addendum 153-55).

As explained in DMV's motion, prohibiting a state agency from effectuating State law causes irreparable harm. Mot. 20; *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("[A]ny time a state is enjoined . . . from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). California law—*not* federal law—requires that non-domiciled CDLs expire no later than the expiration term of legal presence documents. *See* Mot. 5-6; Cal. Code Regs. tit. 13, § 26.02(c). DMV was thus required to cancel CDLs with expiration dates exceeding a driver's legal presence date. Cal. Veh. Code, § 13100. But under California law, DMV must also permit those drivers to apply for a new license *immediately*. *Id.* By prohibiting DMV from renewing or replacing licenses of qualified drivers under California law, FMCSA has impermissibly usurped California's right to effectuate its own laws. *Maine v. Taylor*, 477 U.S. 131, 137 (1986).

Moreover, as explained in DMV's motion, FMCSA's "pause" threatens immediate harm to functioning of California's essential public services and harm to California's economy. Mot. 21-22.

## III. FMCSA'S FINAL RULE MAKES DMV'S REQUESTED STAY MORE URGENT

FMCSA relegates discussion of its recently adopted Final Rule[4] to a footnote, asserting that it "has not yet taken effect." Opp'n 6 n. 2. The Final Rule, which takes effect March 16, dramatically limits the qualifying criteria for a non-citizen to obtain a CDL. 91 Fed. Reg. 7044 (Feb. 13, 2026). Once effective, only people holding a temporary agricultural (H-2A), temporary non-agricultural (H-2B), or treaty investor (E-2) visa will qualify. 91 Fed. Reg. 7044 (Feb. 13, 2026).

Thus, if DMV is prevented from renewing or replacing CDLs of currently qualified drivers because of FMCSA's ongoing "pause," thousands of drivers may forever lose the ability to work in jobs that most have held for years without incident. A stay will allow DMV to renew these qualified drivers' licenses and replace lost licenses before the Final Rule becomes effective.

---

[4] FMCSA's February 13, 2026 Final Rule, *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses* (91 Fed. Reg. 7044 (Feb. 13, 2026)) largely duplicates the Interim Final Rule this Court stayed for being arbitrary and capricious. *Rivera Lujan v. FMCSA*, No. 25-1215, 2025 WL 3182504, at *2 (D.C. Cir. Nov. 13, 2025).

# CONCLUSION

DMV's emergency motion for a stay should be granted.

Dated:  February 18, 2026                    Respectfully submitted,

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
R. MATTHEW WISE
SETH E. GOLDSTEIN
Supervising Deputy Attorneys General

/s/ *Jay C. Russell*

JAY C. RUSSELL
Deputy Attorney General
*Attorneys for Petitioner California*
*Department of Motor Vehicles*

SA2025305909/ 44950710.docx

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(B) because, excluding the parts of the document exempted by the Federal Rules of Appellate Procedure and this Court's rules, this document contains 2,592 words, as calculated by my word processing software.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using Microsoft Word 365.

Respectfully submitted,

/s/ *Jay C. Russell*

# ADDENDA

## INDEX OF ADDENDA

| No. | Description | Page Number(s) |
|---|---|---|
| 1. | Supplemental Declaration of California Department of Motor Vehicles Director Steve Gordon | 17- 30 |

**ADDENDUM 1**

**Supplemental Declaration of California Department of
Motor Vehicles Director Steve Gordon**

No. 26-1027

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

CALIFORNIA DEPARTMENT OF MOTOR VEHICLES
PETITIONER,

V.

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,
RESPONDENTS.

———————————————

## SUPPLEMENTAL DECLARATION OF CALIFORNIA DEPARTMENT OF MOTOR VEHICLES DIRECTOR STEVE GORDON IN SUPPORT OF EMERGENCY MOTION FOR A STAY AND FOR AN IMMEDIATE INTERIM ADMINISTRATIVE STAY

## <u>RELIEF REQUESTED BY FEBRUARY 20, 2026</u>

———————————————

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
R. MATTHEW WISE
SETH E. GOLDSTEIN
  *Supervising Deputy Attorneys General*

KRISTEN C.A. KIDO
SHIWON CHOE
BARBARA HORNE-PETERSDORF
JOSEPH H. MEEKER
DAVID S. GREEN
JAY C. RUSSELL
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3617
Fax: (415) 703-5480
Jay.Russell@doj.ca.gov
  *Attorneys for Petitioner
  California Department of Motor Vehicles*

I, Steve Gordon, under 28 U.S.C. § 1746, declare:

1.    I am the Director of the California Department of Motor Vehicles (DMV) and make this Declaration in support of Petitioner's Emergency Motion for Stay and Immediate Interim Administrative Stay.  I make this supplemental declaration based on personal knowledge, on information I acquired through the performance of my duties at DMV, and on my review of records maintained in the ordinary course of business by DMV.  I am competent to testify to the matters set forth in this Declaration and would competently do so if called upon by this Court.

2.    On December 18, 2025, DMV sent the Federal Motor Carrier Service Administration (FMCSA) its training materials concerning new commercial driver's license policies and procedures.  A true and correct copy of DMV's December 18, 2025 email message transmitting DMV's training materials is attached to this Supplemental Declaration as Exhibit N.

3.    On January 5, 2026, FMCSA sent DMV an email asking DMV to "confirm the current status" of the license cancellations.  DMV responded by explaining that it had complied with FMCSA's demands, requesting an onsite review by FMCSA so that DMV could proceed with issuing licenses, and confirming that was holding license records in their current state.

4.     Accompanying Exhibit J was "a document with answers to FMCSA's questions."  Ex. J at 1 (Addendum 124).  A true and correct copy of that document is attached to this Supplemental Declaration as Exhibit O.

I declare under penalty of perjury that the foregoing is true and correct. Signed on February __18__, 2026 in Sacramento, California.

_____
Steve Gordon
Director, California Department of Motor Vehicles

# EXHIBIT N

**to the Supplemental Declaration of Steve Gordon**

**From:** Soriano, Bernard C.@DMV
**Sent:** Thursday, December 18, 2025 6:10 PM
**To:** Snook, Christopher (FMCSA) <christopher.snook@dot.gov>; scott.hernandez@dot.gov
<scott.hernandez@dot.gov>; Hembeck, Mari (FMCSA) <mari.hembeck@dot.gov>; Jones, Joshua
(FMCSA) <joshua.jones@dot.gov>; Price, Craig (FMCSA) <craig.price@dot.gov>
**Cc:** Triepke, Kristin J.@DMV <Kristin.Triepke@dmv.ca.gov>; Howard, Nakisha G.@DMV
<Nakisha.Howard@dmv.ca.gov>; Wida, Deanna M.@DMV <Deanna.Wida@dmv.ca.gov>
**Subject:** Training

FMCSA team...........Thank you for the productive call this morning.  As discussed,
attached are the training materials used by our field office staff.  Approximately 3,000
employees were trained on these procedures on Dec. 17.  Training occurred in the field
office locations and lasted an hour.  Locations that specialize in CDLs and in business
transactions trained from 7:00AM-8:00AM and all other locations conducted training
from 8:00AM-9:00AM.  Offices are closed to customers during these training periods.

You'll note the training material is labelled 'DRAFT.'  This is because we did not yet move
forward with issuing non-domiciled CDLs.  The draft marking will be removed once we
are issuing. In addition, the redacted portions are the codes used in our computer
system for the transactions.  We are sensitive to those codes being available outside of
our department.

You'll also see the memo addresses
- Mexico and Canada citizens are ineligible to receive a CDL
- Stop issuing temporary CDLs
- Printing "Non Domiciled" on CDLs and CLPs
- Receiving CLPs (recall we cancelled all CLPs)

As mentioned in our meeting, the short-term solution entails the field office staff starting
the intake and the application moving to HQ for completion.  That completion is done
using automation that has the correct business rules and a manual review/intervention
process when necessary.

In addition, there is a fail-safe process where our card production vendor sets aside non-
domiciled CDLs for review prior to mailing.  We can provide a detailed description of the
short-term solution and the fail-safe process in a separate email.


Bernard C. Soriano
M: 916.952.0080

# EXHIBIT O

**to the Supplemental Declaration of Steve Gordon**

# FMCSA Questions – 12/18 and 12/22 emails

1. A comprehensive breakdown of the approximately 65,000 unexpired non-domiciled CDL's
   o Explain the methodology used to identify the 65,000 unexpired non-domiciled CDLs.
      **DMV searched our database to identify all CDL records for customers that provided non-domiciled legal presence documents.**
      - How many CLPs were found to be inconsistent with current FMCSRs? **There were 3,757 valid non-domiciled CLPs on Sept. 26, 2025 (when DMV paused issuing non-domiciled CLPs & CDLs). Of those, 66 were issued pending legal presence verification. All non-domiciled CLPs were cancelled or have expired.**
      - Was the same methodology used to identify the 65,000 CDLs, applied to identify non-compliant CLPs? **For CLPs, the DMV searched through the database to identify CLPs that were issued prior to a legal presence verification.**
   o The December letter indicates approximately 21,100 of the 65,000 unexpired non-domiciled CDLs were identified to have expiration dates beyond the date of the driver's legal presence. During the call today it was identified the SDLA developed methodology and processes which separated the 21,100 drivers into 'buckets', with each having distinct revocation dates.
      - Please identify the different types of buckets and the number of drivers present within each.
         - **There are 3 "buckets" that the CDLs were assigned.**
            1) **CDLs with expiration dates exceeding legal presence date - 17,299 CDLs**
            2) **CDLs given to citizens of Canada or Mexico - 1,613 CDLs**
            3) **CDLs that were federally non-compliant (i.e., non-REAL ID), with expiration dates exceeding legal presence date - 2,719 CDLs**
      - What specific methodology was used to separate each bucket and how did each get categorized?

         **Bucket 1: CDLs with expiration dates exceeding legal presence date**
         **The first bucket contains 17,299 CDLs. To determine if the CDL expiration date was beyond the legal presence expiration date, DMV searched all of the 65,000 records of unexpired non-domiciled CDLs, manually gathered all of the legal presence documents for each record, and compared the legal presence document expiration date to the expiration date of the card, which is identified from the DMV's internal master database of all driver's license records. Then the records were sorted to determine how many had expiration dates that did not align with the legal presence documents.**

**Bucket 2: CDLs given to citizens of Canada or Mexico.**
- **The second bucket contains 1,613 CDLs. This group was identified as part of the manual review of the legal presence documents gathered for each record.**

**Bucket 3: CDLs with expiration dates exceeding legal presence date and which are federally non-compliant (i.e., not REAL IDs).**
- **The third bucket contains 2,719 CDLs. This group was identified in the same manner as the group in Bucket 1.**

- How was the legal presence checked for each CDL/CLP? Legal presence is checked for each CDL/CLP. **A SAVE check is performed automatically in the field office. The DMV's licensing computer system – called EASE – is programmed to check SAVE as part of each application. Additionally, for transactions sent to HQ for further processing, staff manually perform a second SAVE check.**
- It was indicated SAVE was queried for each driver. Is there a scenario where a SAVE query/legal presence check was not required. **No.**
- Of immediate concern were buckets of drivers which will have their licenses revoked on 1/5/2025.
  - Please provide a list (or lists) of drivers from each of these buckets. **As discussed in our December 18, 2025 meeting, we can provide a sample for FMCSA review. In addition, FMCSA is welcome to re-check the original sample of 145 records used in the annual review. Finally, we invite FMCSA on-site to review as many records as desired.**
  - We can discuss dates for review of these records (likely in person) once received.
  - NOTE: If the SDLA intends on extending the initial revocation deadline from 1/5/2026, the SDLA is required to notify FMCSA in writing of this proposed extension, as it deviates from the dates outlined within their 12/10 letter. **Notification was provided in the December 24, 2025, email to FMCSA.**

2. Specifics on the proposed short-term solutions to your non-domiciled license issuance process.

   o The December letter provides general framework for the solution but does not provide sufficient detail on the program deployed, monitoring processes implemented, or the data fields used.
   o Please provide specifics on the Headquarters license issuance process.

# FMCSA Questions – 12/18 and 12/22 emails

- What processes have changed? **Before the audit, technical limitations in DMV's computer system meant that incorrect expiration dates were automatically assigned for some non-domiciled CDLs. If this error was not detected by field office technicians, it would not have been corrected. Going forward, using DMV's short-term solution, all applications will be routed to DMV HQ for processing. The DMV's intelligent automation (bot) will automatically verify the SAVE response against the customer's legal presence document. The system will then automatically match the license expiration date to the expiration date of the legal presence document. This bypasses the software error in our current computer program.**

- How will the new program be regularly monitored for continued compliance. **Headquarters staff will periodically review a sampling of the legal presence documents presented and the SAVE inquiry conducted to ensure the cards are issued appropriately.**

- Will it be rolled out statewide, if so, when? Statewide. **Customers will be able to apply for CDLs statewide, and all applications will be routed to headquarters for final processing. We have been ready to implement this short-term solution as of December 17, 2025, and staff have been trained to follow this procedure as of that date. However, at FMCSA's instruction, we have not lifted the pause on issuing non-domiciled CDLs.**

o Please provide details of the license issuances routing through Headquarters.

  - What is the flow chart from field location to routing to headquarters, and what safeguards are in place to prevent those field offices from issuing a license? **Customer applies for CDL and provides non-domiciled legal presence documentation. DMV's system will not finalize the application or issue a CLP. Instead, the application will be forwarded to the bot at headquarters. A bot will automatically verify SAVE against the legal presence document, then match the license expiration date to the expiration date of the legal presence document.** Have the license issuance permissions for field office employees been removed? **Yes. On September 29, 2025, field office employees were directed to stop issuing non-domiciled CLPs and CDLs. On October 28, 2025, programming modifications to prohibit field office employees from issuing non-domiciled CLPs and CDLs were released into production; field office employees are no longer able to issue non-domiciled CDLs.**

    - What is the anticipated oversight by headquarters staff? **Headquarters staff will periodically review a sample of the legal presence documents presented and the SAVE inquiry conducted by the bot to ensure the cards are issued appropriately.**

  - What happens when the license information gets routed to headquarters?

> **The newly developed bot automatically verifies SAVE against the legal presence document presented with each new CDL application. Then the bot automatically terms the CDL expiration date to match the driver's legal presence expiration date. If the SAVE response is one that the bot cannot process, the transaction is then manually reviewed by HQ personnel.**

- How does headquarters anticipate handling the volume of license reviews/issuances**? Headquarters will utilize multiple units to conduct the reviews.**

o It was indicated field training was conducted on 12/17. Please provide the memo distributed, as well as any other policies or procedures developed and deployed, in addition to a mechanism to confirm all field staff have been (or will be) trained on the new solution. **Training was provided on December 17, 2025. See attachment in email sent on December 18, 2025. Field offices were instructed to record which employees received the training on December 17th and continue to record training that occurs on an ongoing basis for employees who were absent on December 17, 2025.**

o Please confirm if it will be possible to test this solution in an environment mirroring production. **Yes.**

- Is it possible field staff could override this solution to issue a regular CDL to an individual? **No.**
- If not, what solution was put in place to prevent this? **N/A.**

3. Specifics on the long-term solutions to your non-domiciled license issuance processes.

o The December letter indicates the project to implement the proposed long-term solution is currently being worked on and will take six months. Given the reported staffing shortages and priority struggles, please indicate if the proposed rollout is six months from the date of the letter, or an estimate to be determined later. **To clarify, DMV does not have staffing shortages and priority struggles. Developers for this effort are currently working on National Medical Registry II. As they become available, they will work on this project. This effort will take approximately six months from the date the programming begins. In the interim, the short-term solution is designed to resolve all issues discovered during DMV's internal audit.**

o How often will training be conducted to ensure field staff remain apprised of changes to policies and procedures. In what manner will this training be delivered**? In addition to the training already provided on December 17, the training will be provided to new staff and those that were not available that day, and any updates to that training will become part of the onboarding training for employees and refresher training will be conducted as needed.**

o Will there be a mechanism to track completion of training by field/HQ staff? **Yes.**

- What percentage of front-line employees have attended, or will attend training, on the issuance of non-domiciled CDLs? **All field office staff will be trained.**

# FMCSA Questions – 12/18 and 12/22 emails

- Are the Headquarters (HQ) staff trained differently from field office (FO) staff? **Yes. Headquarters staff perform specialized processing that field office personnel are unable to complete. They will also have access to the training information provided to field office.**
- How will newly hired employees be trained on non-domiciled license issuance practices? **Training will become part of the onboarding training for employees and refresher training will be provided as needed.**

4. Specifics on how your headquarters staff will monitor the short- and long-term solutions.
   - o How often will headquarters staff be making these checks?
     **Short term: daily manual review.**
     **Long term: completely automated. An audit will be conducted regularly to ensure compliance.**
   - o What mechanism will be in place to ensure any erroneous expiration dates are captured and corrected?
     **Short Term: The applications will be sent to Headquarters for final processing by the bot. The bot work will be reviewed and audited for continued accuracy. Any transactions that cannot be completed by the bot will be done manually. Any non-domiciled cards issued will be reviewed by headquarters staff before mailing to customers.**

     **Long Term: For all applications where the customer has provided a limited term non-domiciled legal presence document, the updated system will prompt field office technicians to ensure presentation of legal presence documents and will interpret SAVE responses to automatically assign expiration dates based on the expiration of the applicant's legal presence document. The records will be marked as limited term in our system to ensure that DMV continues to request new legal presence documents when licensees return for subsequent transactions. Non-domiciled applications will be processed in a field office, and audited for continued accuracy.**

5. Specifics on the policies and procedures being updated to address CLP/CDL issuances to non-DACA recipients.

   - o How often will training be conducted to ensure field staff remain apprised of changes to policies and procedures. In what manner will this training be delivered? **As described above, this training will become part of the onboarding training for employees and refresher training will be provided as needed.**
   - o Will there be a mechanism to track completion of training by field/HQ staff? **The field offices track training by requiring staff to complete training forms.**
   - o In your system, if an applicant selects 'Mexico' as their country of citizenship, does a hard stop trigger immediately, or does it rely on a headquarters or field office employee noticing

the country? **Our application does not have this question. Field offices will not process the application unless the applicant is a DACA recipient.** How exactly does your system distinguish a DACA recipient from a standard Mexican national? **Field offices will not process the application unless the EAD indicates C33. In the future, DMV will also make system changes to programmatically prevent the issuance of a non-domiciled CDL to an applicant who is a Mexican citizen, unless they are a DACA recipient, based on the EAD and SAVE response.**

- Does it require a specific code from the Employment Authorization Document (EAD) (e.g. C33) to proceed? **Field offices will not process the application unless the EAD indicates C33. Once processed, the SAVE response must also show that the applicant is a DACA recipient, or the application will be denied.**

6. Provide any guidance supplied by USCIS or DHS relative to issuance, renewals, extensions of expiration dates of legal presence documentation.

   **DMV drafted the chart below with input from DHS, and DHS confirmed to DMV that it is correct:**

| If the Verified Response Received Specifies | Then |
|---|---|
| A clearly defined end date | Key the end date as the applicant's expiration date for their DL/ID card. |
| Conflicting end dates | Key the end date that extends the applicant's DL/ID card out the furthest. |
| Duration of Stay (D/S) | Key **1-year** date from the applicant's DL/ID card application date. (**EXAMPLE:** If the applicant completed their DL/ID card renewal application on October 1, 2019, issue their DL/ID card with a September 30, 2020, expiration date.) |
| No Date | Key **1-year** date from the applicant's DL/ID card application date. (**EXAMPLE:** If the applicant completed their DL/ID card renewal application on October 1, 2019, issue their DL/ID card with a September 30, 2020, expiration date.) |

7. DMV's letter indicates the DMV will cease the practice of issuing temporary non-domiciled CDLs and CLPs to all applicants, both domiciled and non-domiciled. Please provide supporting policies, procedures, and statutes or rules. See attached.

   o Is there ever a time this could be overridden by staff? If so, who may perform the overrides and in what scenarios? DMV's programming will prohibit the issuance of a temporary CDL or CLP for non-domiciled customers.

   o The DMV has admitted temporary license were not being reported to CDLIS. What has the DMV done to ensure every transaction, including 'K' restriction removals or temporary issuances, are now immediately pushed to CDLIS? **DMV has ceased issuing temporary CDLs/CLPs. All other types of transactions, including adding and removing restrictions, are updated to the record and report the most current information via CDLIS.**

   o Can the DMV confirm it has discontinued its practice of issuing a temporary license prior to the verifications of lawful status or otherwise ensure all drivers are eligible to hold the

driving privileges of their respective CDLs? **Yes, we have ceased the issuance of temporary licenses to CDL applicants and have removed the ability to issue temporary licenses from our system.**

o Can the DMV confirm all convictions, while a driver was operating under a temporary license, have now been updated and recorded to CDLIS? **Yes.**

o What policies/procedures/training/systems have changed? Please provide details. **As described throughout these responses and in our December 10 letter, DMV has made and is continuing to make changes to policies, procedures, training and systems based on directives from FMCSA.**

8. On Page 8 of the December 10, 2025, response letter from the DMV, it was indicated "DMV's internal audit uncovered certain situations in which the system failed to properly notate a CDL as a limited term."

o In this case, the CDL would not be identified as limited term; therefore, has the DMV conducted an audit of each 'standard' CDL issuance to ensure those licenses were issued properly? **While DMV's processing system may not have notated the CDL as limited term non-domiciled for the purposes of processing transactions, DMV did not issue standard cards (without limited term marking) to customers that presented limited term non-domiciled legal presence documents. Therefore, the methodology used to identify CDLs with expiration dates exceeding legal presence dates based on records of limited-term CDL cards captured all non-domiciled CDLs.**

o If so, how many standard CDLs were improperly issued? **None.**

9. California claimed the removal of a 'K' restriction wasn't an 'issuance' until FMCSA corrected this assertion on October 23, 2025.

o Has the DMV audited every other transaction type (e.g. address change, duplicate licenses, adding varying endorsements, downgrades/upgrades) to guarantee no other issuance transactions are bypassing lawful presence verifications? **DMV has implemented corrective measures to ensure that legal presence documents are verified, consistent with FMCSA regulations.**

10. It's being reported California "will not act on the notices of cancellations". Can you please explain whether California has changed their position on license cancellations or whether cancellations will be effective January 5, 2026, as initially communicated? **The report that California "will not act on the notices of cancellations" is inaccurate. DMV addressed this question via email on Dec. 24, 2025.**

30

# CERTIFICATE OF SERVICE

Case Name:  ***California Department of Motor Vehicles v. U.S. Department of Transportation, et al.***        Case No.   **26-1027**

I hereby certify that on <u>February 18, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **PETITIONER'S REPLY IN SUPPORT OF EMERGENCY MOTION UNDER CIRCUIT RULE 18 FOR A STAY AND FOR AN IMMEDIATE INTERIM ADMINISTRATIVE STAY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 18, 2026</u>, at San Francisco, California.

<table>
<tr><td>M. Mendiola</td><td></td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2025305909
44967245.docx